MARTIN E. FLACK AND OTHERS, RESPONDENTS, v.
NATIONAL BANK OF COMMERCE, APPELLANT.

DURESS.—ATTACHMENT.—BOND A SECURITY.—*Semble* that the bond
given in attachment proceedings is ample security in case it
turns out that the attachment is wrongfully issued, and the
threat of attachment proceedings is not duress.

BANKS AND BANKING. — DEPOSIT. — PAYMENT UNDER DURESS. —
*Semble* that if a depositor having funds on deposit in a bank
directs the bank to ˙ apply his money on deposit to the satis-
faction of a claim of the depositor against the bank, which
direction is made under duress, such direction may be treated
as never having been given, and if the bank afterwards refuses
to honor a check, to meet which the depositor would have
had funds in the bank, provided such direction had not been
given, the depositor may sue the bank directly for damages
for refusing to honor his check.

ATTACHMENT.—DURESS.—DAMAGES.—Where a party is indebted to
a bank on an unsecured note not yet due, and is in embarrassed
or failing circumstances, and his property is liable to be
attached and the bank garnished by his creditors, and the
bank threatens to begin attachment proceedings against him
in order to save itself from loss unless he secures the note,
which he refuses to do, but instead thereof authorizes the
bank to appropriate sufficient of his deposit in the bank to
pay his note, such payment is not made under duress and
cannot be recovered back or treated as never having been
made.

APPEAL from a judgment of the district court of the
first district and from an order refusing a new trial. The
opinion states the facts, but § 3310, 2 Comp. Laws, 1888,
is as follows:

"Before issuing the writ (of attachment) the clerk must
13

require a written undertaking on the part of the plaintiff in a sum not less than two hundred dollars and not exceeding the amount claimed by the plaintiff, with sufficient sureties that if the defendant recover judgment, or if the attachment be wrongfully issued, the plaintiff will pay all costs that may be awarded to the defendant, and all damages which he may sustain by reason of the attachment not exceeding the amount of the undertaking."

*Mr. Elmer B. Jones* and *Messrs. Kellogg and Corfman,* for the appellant.

*Mr. J. W. N. Whitecotton,* for the respondent.

ANDERSON, J.:

This is an action by the plaintiffs against the defendant to recover damages alleged to have been sustained by plaintiffs by reason of defendant refusing to pay plaintiffs' check drawn on it when plaintiffs, it is alleged, had funds on deposit in said bank sufficient to pay the check. The complaint alleged that the plaintiffs, M. E. and W. C. Flack, were doing business as merchants at Provo, under the firm name of M. E. Flack & Co., and that J. B. Flack was their manager and general business agent; that on February 20, 1891, M. E. Flack & Co. had on deposit in the defendant's bank $350, and that on that date plaintiffs issued their check on the bank for $250, and sent it to Flack, Moriarty & Co., of Grand Junction, Colorado, by whom it was transferred to the State National Bank of Denver, Colorado; that it finally reached the Commercial & Savings Bank of Provo, and was presented to the defendant for payment, and payment was refused on the ground that plaintiffs did not have sufficient funds in the bank to meet it. The complaint alleged that plaintiffs did have sufficient funds on deposit with the defendant to pay the check, and that, by the defendant refusing to pay the

check, it went to protest, whereby plaintiffs were damaged in their credit and in their business in the sum of $20,000. The defendant by its answer denied all the allegations of the complaint, and alleged that on the 20th day of February, 1891, it loaned M. E. Flack & Co., through J. B. Flack, their agent, $300 on their unsecured promissory note; that on the next· day Flack, Moriarty & Co., of Grand Junction, Colorado, failed and made an assignment, owing largely in excess of their assets, and that the plaintiffs and the said J. B. Flack were partners in that firm; that, plaintiffs' note, being unsecured in any way, the defendant, upon learning of the failure of Flack, Moriarty & Co., demanded of plaintiffs that they secure the payment of their note, and stated that, unless this should be done, it would institute attachment proceedings against plaintiffs on the note; that thereupon J. B. Flack, for plaintiffs, authorized defendant to apply the funds on deposit in the bank to the payment of the note, which was accordingly done, and the note marked "Paid;" that, after paying the note as directed by plaintiffs' agent, the bank did not have sufficient funds remaining belonging to plaintiffs to pay the check, of which fact plaintiffs had full knowledge; that the check in question was presented to the bank for payment February 27, 1891, when there were no funds to meet it, and defendant refused to pay it, and notified plaintiffs of such refusal. There was a verdict and judgment in favor of the plaintiffs for $750, and the defendant brings this appeal from the judgment, and from the order of the court overruling defendant's· motion for a new trial.

It was not disputed at the trial in the district court that plaintiffs gave the defendant the right to pay their note out of their funds on deposit with the bank; but the plaintiffs claim this authority was given under duress, and was not binding on them, and constituted no defense to this action for damages for refusing to pay plaintiffs' check drawn against the deposit. E. B. Jones, a witness

for defendant and president of the defendant's bank, testified that on the 24th day of February, four days after the note was given, he went to J. B. Flack, and said to him: "'Mr. Flack, I understand the firm of Flack, Moriarty & Co., of which you are a member, of Grand Junction, assigned on last Saturday; and, if that is true, the creditors of that firm are liable to come in here and attach your stock and garnishee the bank, and take what money you have there, and we feel as if this note should be fixed up some way.' He says, 'It is true, Flack, Moriarty & Co., of Grand Junction, have assigned for the benefit of their creditors, and that they owe a large amount of money; but,' he says, 'that firm does not have anything to do with this.' I says, 'Isn't your name M. E. Flack? He says, 'No; I haven't anything to do with this except as manager.' This is the first knowledge I had he wasn't M. E. Flack, a member of the firm. I said, 'This note isn't due, but we must have it fixed up, because creditors are liable to attach the stock, and we shall lose it.' I says, 'You had better fix it up now; we don't feel like standing out with this note.' The money was in the bank; it was only borrowed the Friday before. He says, 'If you people think I can't pay $300, I will just pay it.' I says, 'Very well.' He says, 'I will just authorize you to charge up to my account any money that may be here on deposit in the bank to pay that note.' I said, 'Very well; * * * you just go in and tell the cashier.' I took him to the bank. Mr. Redfield was sitting there, and Mr. Wallace, the assistant cashier, was in the bank. I stated to Mr. Wallace what the conversation was that I had had, and I said, 'Mr. Flack authorizes you to pay the note out of the funds that he has here on deposit.' Mr. Wallace said, 'Very well;' and then Mr. Flack went out. The money was applied on the note, and it was marked 'Canceled.'" On cross-examination the witness testified that he told Flack that the matter had to be fixed up; that, unless the note

was paid or secured, they would immediately institute proceedings to collect the note, but didn't remember that he said attachment proceedings, but supposed he did, and that that was what he meant; that the conversation was on the Saturday before, and that nothing was said about attachment proceedings when Flack went in to fix the note; that he had told him that they felt insecure and unsafe, and wanted it fixed up; that he could have the loan of the money if he would give security, but that all the bank had was the note of M. E. Flack & Co., and the company had failed. J. W. Wallace, a witness for defendant and assistant cashier of the defendant's bank, testified that Jones brought Flack into the bank, and stated that he and Flack had come to an agreement to the effect that "if we saw fit we could charge up any money we had in the bank to the payment of this note; and he asked Mr. Fiack if that was the substance of the matter, and Mr. Flack said it was." The witness further testified that the note was immediately canceled, and the amount charged up to the plaintiffs, which only left about $59.62 on deposit to plaintiffs' credit, and that if the note had not been paid there would have been sufficient funds on deposit to have paid the check which had been drawn in favor of Flack, Moriarty & Co. C. S. Thompson, a witness for defendant and cashier of the bank, testified that he and Jones had a conversation with J. B. Flack on February 24th, in which they asked· him, in view of the assignment of Flack, Moriarty & Co., to secure the note, and Flack said he couldn't do it without giving a mortgage on his stock in the store. That on the 27th of February he went to Flack's store, and told him the check had been presented to the bank, and they had refused to honor it, because there was not sufficient funds. Flack said, "I don't know what I will do about it." That he then told Flack that if he would give the bank a secured note they would take up the check for him, and that he replied that he wouldn't

do that, because it would be published in all the commercial reports in twenty-four hours, and said the check would have to go to protest. Charles Redfield, a witness for the defendant, testified that he was one of the directors of the bank, and was present and heard the conversation on the 24th day of February between Jones, Flack and Wallace, the assistant cashier; that Jones stated to Wallace, in the presence of Flack, that Flack had consented to charge his account against the note; that Flack said, "I don't care anyway; it can be charged up; I can raise $300 at any time." In rebuttal, J. B. Flack was asked if he had authorized the bank to charge the note up to him or M. E. Flack & Co. In answer he said: "I told the gentlemen that in case the stock should be attached, as they thought it would be, then there would be plenty of time to charge it in. I also said, 'Gentlemen, I have a check out against that deposit of $350 which must be paid, and, of course, I couldn't allow it to go to protest.' They said that would be all right; 'we will protect you.' I told them that if I hadn't that check out of $250, rather than that they should feel uneasy about it I could pay them anyhow half of it, $150, and possibly $250; but, as I had that check out for $250, it would have to be paid, and they told me it would be all right."

We think the foregoing evidence, which is all that was offered to sustain the claim that the payment of the note was made under duress, wholly fails to establish it. The evidence at the trial showed that the day after the note was given and this deposit made the firm of Flack, Moriarty & Co., of Grand Junction, failed for a large amount, and that J. B. Flack, plaintiffs' manager, was a member of that firm. It also showed that over $1,200 worth of goods, shipped to plaintiffs, had been replevied from plaintiffs by Rothschild Bros., of Chicago, from whom they had been purchased. It also showed that one or two other creditors were uneasy about their claims against

the firm. Under all the evidence in the case, we think the defendant had good' reason to feel uneasy about the ultimate payment of the note, and it is not strange that security should have been demanded. It will be observed that the defendant did not demand payment, but security. The officers of the bank feared the creditors of plaintiffs, after the failure of Flack, Moriarty & Co., would attach plaintiffs' stock of goods and garnish the bank; and that defendant would lose its claim. Plaintiffs refused to secure the note, for the reason that they would have to mortgage their stock of goods to do so, which their agent, J. B. Flack, would not do, but chose to pay the note in preference. The defendant made no threat to appropriate plaintiffs' deposit to the payment of the note without permission to do so. The only threat made was to institute legal proceedings by attachment, to collect the note in case security should not be given, which it might lawfully do if the facts justified it, although the note was not yet due. 2 Comp. Laws, § 3308. Before the defendant could have caused a writ of attachment to issue against the property of the plaintiffs, a bond would have been required, which would have been ample security to plaintiffs in case it had turned out that the writ was wrongfully sued out. In such a case the party is bound to make his defense in the first instance, and he cannot postpone the litigation by paying the demand in silence, and afterwards suing to recover it back. *Mays* v. *Cincinnati*, 1 Ohio St. 268.

In *Forbes* v. *Appleton*, 5 Cush. 117, a payment of money was made in order to prevent the obligee in a bottomry bond from attempting to enforce the same by taking possession of the vessel, and the court held that it was not a compulsory, but a voluntary payment; and, if the money was not due, the debtor had no right of action to recover it back, although he declared at the time of payment that he made it under coercion, and intended to

reclaim the same by action. The court said that "the principle of law is a very familiar and a very salutary one that, where a person, with a full knowledge of all the circumstances, pays money voluntarily under a claim of right, he shall not afterwards recover back the money so paid. * * * In general, the cases that have been treated as exceptions are cases where the possession of the property upon which the lien is claimed was already in the party demanding the money, or cases in which the party had no other means to save himself from imprisonment, or his property from sale, on execution or warrant of distress, but by the money demanded." The court of appeals of Maryland, in an ·elaborate opinion, considers "the doctrine as established that a payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual and existing duress, imposed upon it by the party to whom the money is paid." *Mayor, etc.,* v. *Lefferman,* 4 Gill, 425. See, also, *Buford* v. *Lonergan,* 6 Utah, 301, 22 Pac. Rep. 164. In *Clark* v. *Dutcher,* 9 Cow. 674, it was held upon a full examination of the English authorities, that where money is paid with a full knowledge of all the facts and circumstances upon which it is demanded, or with means of such knowledge, it cannot be recovered back upon the ground that the party supposed he was bound in law to pay it, when in truth he was not. See, also, *Mayor, etc.,* v. *Lefferman,* 4 Gill, 425; *Brumagim* v. *Tillinghast,* 18 Cal. 265; *Mays* v. *Cincinnati,* 1 Ohio St. 269; *Forbes* v. *Appleton,* 5 Cush. 117; *Dunham* v. *Griswold,* 100 N. Y. 224, 3 N. E. Rep. 76; *Glass Co.* v. *City of Boston,* 4 Metc. (Mass.) 189. It is true this is not a direct action to recover back money claimed to have been paid under duress, but it is an action for damages against the defendant for not paying a check drawn by plaintiffs out of funds which plaintiffs had authorized defendant to use in payment of its note, but which

authority they claim to have given under duress, and which should therefore be treated as having never been given; so that the foundation of the action is the alleged duress, and plaintiffs' right to maintain it depends entirely upon the question as to whether the payment of the note was voluntary or under coercion. If the payment of the note was made under duress, and might have been recovered back by a direct action for that purpose, then it should be treated as not having been made at all, and the money should be treated as still on deposit in the defendant's bank. Ordinarily it is the duty of a bank to honor the checks of a depositor to the extent of his deposits, and for a refusal to do so an action may be maintained against the bank for any damage the customer may sustain by reason of such refusal. *Marzetti* v. *Williams*, 1 Barn. & Adol. 415; *Rolin* v. *Steward*, 14 C. B. 595; 1 Suth. Dam. 129. It will thus be seen that plaintiffs' right to maintain this action depends wholly on the question as to whether or not the plaintiffs' direction to defendant to appropriate their deposit to pay the note was made voluntarily or under duress, within the meaning of the law.

The court instructed the jury that if the plaintiffs authorized the defendant to apply the money deposited with it to the payment of the note, and that they did so because of the demand of the defendant for payment or security, and the threat of attachment proceedings in case payment should not be made or security given, then such payment was made under duress, and was as if no payment had been made at all, and that defendant's appropriation of plaintiffs' money in payment of the note was without any valid authority, and that the money was to be treated as still on deposit for plaintiffs' use and benefit, and that defendant would be liable to plaintiffs for its refusal to pay the check when presented for payment. We think the court erred in this instruction.

Where a party is indebted to a bank on an unsecured note not yet due, and is in embarrassed or failing circumstances, and his property is liable to be attached and the bank garnished by his creditors, and the bank threatens to begin attachment proceedings against him in order to save itself from loss unless he secures the note, which he refuses to do, but instead thereof authorizes the bank to appropriate sufficient of his deposit in the bank to pay his note, such payment is not a payment under duress, and cannot be recovered back by action; nor can such payment be treated as not having been made, and the bank held liable in damages for not honoring a check drawn against the funds thus appropriated. The judgment of the district court is reversed, with costs, and remanded and a new trial granted. Reversed.

ZANE, C. J., and MINER, J., concurred.